## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

                  **Plaintiff,**

v.                                       **Case No. 16-40005-01-DDC**

ROYELLE L. MILLER (01),

                  **Defendant.**

## MEMORANDUM AND ORDER

This matter comes before the court on defendant Royelle L. Miller's Motion to Suppress (Doc. 15). Mr. Miller contends that the court must suppress all evidence, including a handgun, discovered by law enforcement during a search of his vehicle. Mr. Miller contends that the Fourth Amendment requires suppression here because law enforcement unlawfully: (1) stopped his vehicle and seized Mr. Miller without first observing a traffic violation; and (2) searched the vehicle without a constitutional basis to do so. The government has filed a response (Doc. 22) opposing Mr. Miller's suppression motion. And the court conducted an evidentiary hearing on the motion on May 24, 2016. After the hearing, Mr. Miller asked to submit a post-hearing brief, and both parties filed post-hearing briefs. *See* Docs. 27, 32. Having reviewed the evidence and arguments presented by the parties, the court denies Mr. Miller's motion. It explains why, below.

### I.      Background and Controlling Facts

The government has charged Mr. Miller, a convicted felon, with one count of possessing a firearm in violation of 18 U.S.C. §§ 922(g) and 924(a)(2). *See* Doc. 1. This charge arises from a series of events early in the evening of January 5, 2016.

That night, Topeka Police Officer and U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives Taskforce Officer Jeralyn Wheeles conducted a "surveillance operation" targeting Mr. Miller.  Officer Wheeles described the purpose of the operation during the court's evidentiary hearing.  She explained that a Kansas Capitol Police officer had informed her that he recently had stopped Mr. Miller for a traffic violation.[1]  During that stop, the Capitol officer observed a handgun in Mr. Miller's possession.  The Capitol officer did not arrest Mr. Miller at the time, however, because the officer's call to dispatch failed to reveal that Mr. Miller was a convicted felon.  The Capitol officer told Officer Wheeles that he learned later that Mr. Miller was, in fact, a convicted felon prohibited by law from possessing a gun.  Acting on this information, Officer Wheeles arranged for Topeka Police officers to surveil Mr. Miller's residence.  Officer Wheeles testified that she hoped to observe Mr. Miller leave the residence, commit a traffic violation, and, thus, give officers a legal basis to conduct a traffic stop.

During the operation, Topeka Police officers watching Mr. Miller's residence alerted Officer Wheeles over the police radio that a man believed to be Mr. Miller and a female passenger had left the residence in a red Mercury Mountaineer.  Shortly after receiving this message, Officer Wheeles saw the Mountaineer drive past her, westbound on 14th Street.  Officer Wheeles, in an unmarked car and plain clothes, began to follow the vehicle, watching for a traffic violation.  She did not have to wait long.  The Mountaineer turned from 14th Street onto Western Avenue without activating its turn signal at least 100 feet before the turn—a violation of

---

[1]     The Kansas Capitol Police is "a full service law enforcement entity within the Kansas Highway Patrol in Shawnee County, Kansas."  *Capitol Police Officer*, Kansas Highway Patrol, http://www.kansashighwaypatrol.org/263/Capitol-Police-Officer (last visited Aug. 11, 2016).  Its officers "enforce traffic laws, regulate traffic flow, and investigate accidents and crimes on and around state-owned property in Shawnee County, Kansas."  *Id*.

Kan. Stat. Ann. § 8-1548.[2]  Officer Wheeles contacted Topeka Police officers working in marked

cars and asked them to stop the Mountaineer for the traffic violation she had observed.  She also

continued to follow the Mountaineer as the marked cars responded.  Officer Wheeles watched as

the Mountaineer turned five more times without giving a proper signal, as Kan. Stat. Ann. § 8-

1548 requires.  Finally, the Mountaineer pulled into a parking spot, facing a row of apartments,

in an alley near the 1300 block of Clay Street.  Officer Wheeles watched a female passenger exit

the Mountaineer and enter an apartment.  The driver stayed in the vehicle.

Topeka Police officers Evan Friedrichs and Alexander Wall responded first to the scene

of Officer Wheeles's call.  Arriving at the alley from the south, Officer Friedrichs maneuvered

the officers' patrol car behind the parked Mountaineer.  Officer Friedrichs also engaged the car's

spotlight and directed it toward the Mountaineer.  When the light illuminated the vehicle's

interior, Officer Friedrichs and Officer Wall saw the driver reach down toward the center console

or the passenger-side floorboard.  Both of the officers testified that this movement alarmed them

because they had learned earlier that Mr. Miller might possess a firearm.  Another uniformed

officer, Michael Hendricks, arrived from the north entrance of the alley just after Officer

Friedrichs and Officer Wall.  He parked his patrol car facing south, at least 15 to 20 feet from the

Mountaineer.

Officer Friedrichs and Officer Wall got out of their patrol car and approached the

Mountaineer from its rear.  Officer Friedrichs moved toward to the driver's door and Officer

Wall approached on the passenger side.  Officer Hendricks also walked from his patrol car to the

driver's door.  All three officers testified that as they approached the Mountaineer, they smelled

---

[2]        Kan. Stat. Ann. § 8-1548(a) requires drivers to give "an appropriate signal" before turning a vehicle on a Kansas roadway.  To that end, drivers must signal their intention to turn "continuously during not less than the last one hundred (100) feet traveled by the vehicle before turning." Kan. Stat. Ann. § 8-1548(b).

burnt marijuana emanating from inside.  Officer Friedrichs and Officer Wall described the smell as a strong odor.  In contrast, Officer Hendricks testified that he detected a faint odor of marijuana smoke from the direction he approached.

As they continued to move toward to the Mountaineer, Officer Friedrichs called out to the other officers, "He's digging in there; someone's digging in there."  Doc. 27, Attach. C (Officer Friedrichs's body camera video).  And both Officer Friedrichs and Officer Wall ordered the driver to place his hands on the steering wheel.  The driver complied.  When Officer Friedrichs reached the driver's door, he opened it and demanded the driver to get out of the Mountaineer.  The driver did not exit immediately.  Instead, he asked Officer Friedrichs, "For what?"  *Id.*  Officer Friedrichs grabbed the driver, pulled him from the Mountaineer, and detained him.  Officer Wall moved toward the driver's door to assist Officer Friedrichs.  Once Officer Friedrichs had secured the driver, Officer Wall began to search the vehicle's interior.  Officer Wall testified that he entered the vehicle to find the source of the marijuana odor he had smelled and to determine whether the driver had hidden a firearm inside.  Officer Wall found a blunt—which he described as a hollowed out cigar or cigarillo stuffed with marijuana—in the center console.  Another officer joined the search and discovered a handgun under the front passenger's seat.

Officers identified the driver as Royelle Miller, the defendant in this case.  They arrested him on charges accusing him of possessing marijuana and a firearm.

## II.    Analysis

Mr. Miller contends that the Fourth Amendment requires the court to suppress all evidence discovered during the search of his vehicle.  He argues that two reasons require this result.  First, Mr. Miller contends that law enforcement stopped his vehicle and seized him

without a constitutional basis to do so.  Second, Mr. Miller contends that law enforcement's search of the vehicle was illegal because Officer Friedrichs opened the Mountaineer's door "without cause or permission."  Doc. 15 at 2.  In his post-hearing brief, Mr. Miller also urges the court "to discredit almost all of the officers' testimonies."  Doc. 27 at 13.  He alleges that law enforcement set out on January 5, 2016, to arrest him and to pressure him to testify in a murder trial pending in Kansas state court.  Thus, he contends, "Officer Wheeles may not have actually seen traffic violations" and Officers Friedrichs, Wall, and Hendricks "may not have smelled any marijuana at all."  *Id*.  The court addresses Mr. Miller's theories, in turn, below.

### a.  Law enforcement's stop and seizure of Mr. Miller complied with the Fourth Amendment.

Mr. Miller contends that law enforcement lacked any legal basis to stop his vehicle and seize him.  He asserts that he "had committed no violation of any law" and, instead, had been sitting peacefully in his vehicle for five to ten minutes before Officer Friedrichs and Officer Wall arrived.  Doc. 15 at 5.  But this argument ignores the credible testimony of Officer Wheeles, Officer Friedrichs, and Officer Wall.

Officer Wheeles testified in explicit detail how she had followed Mr. Miller as he left his residence and drove to the alley in the 1300 block of Clay.  She also testified that she saw Mr. Miller fail repeatedly to use a turn signal at least 100 feet before turning, as Kan. Stat. Ann. § 8-1548 required.  Also, Officer Wheeles reported each traffic violation and Mr. Miller's location to uniformed officers as she followed him.  And, when Mr. Miller parked in the alley, Officer Wheeles watched him sit in his vehicle until Officer Friedrichs and Officer Wall arrived.  Officer Friedrichs and Officer Wall confirmed that Officer Wheeles had reported Mr. Miller's traffic violations and location over the police radio.

"It is well-settled that 'an initial traffic stop is valid under the Fourth Amendment . . . if based on an observed traffic violation.'" *United States v. McGehee*, 672 F.3d 860, 868 (10th Cir. 2012) (quoting *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998)). "Moreover, it is also permissible where an officer 'has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.'" *Id*. (quoting *Hunnicutt*, 135 F.3d at 1348). "Reasonable suspicion requires only 'some minimal level of objective justification.'" *United States v. Conner*, 699 F.3d 1225, 1228 (10th Cir. 2012) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). And, where "law enforcement officials rely on a bulletin or alert to conduct a stop or make an arrest, the relevant inquiry is whether the officer who issued the alert—rather than the officer who conducted the challenged action—had the requisite level of suspicion." *United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1227 (10th Cir. 2008) (citations omitted).

Here, credible evidence establishes that Officer Wheeles watched Mr. Miller make several turns which, she contends, violated Kan. Stat. Ann. § 8-1548. From her firsthand observations, Officer Wheeles had reasonable suspicion to believe that Mr. Miller had committed a traffic violation. *See McGehee*, 672 F.3d at 868; *Conner*, 699 F.3d at 1228. And, because she possessed the requisite level of suspicion to justify a stop of Mr. Miller's vehicle, the same goes for the uniformed officers who conducted the stop at her request. *See Rodriguez-Rodriguez*, 550 F.3d at 1227.

The government has demonstrated that law enforcement officers had reasonable suspicion to stop and seize Mr. Miller. The initial stop of Mr. Miller's vehicle thus complied with the requirements of the Fourth Amendment. The court thus denies Mr. Miller's argument on this point.

### b. Probable cause justified law enforcement's search of Mr. Miller's vehicle.

Mr. Miller next contends that law enforcement violated his Fourth Amendment rights when it searched his vehicle without a warrant or other constitutional basis to search. Mr. Miller asserts that the officers began searching his vehicle when Officer Friedrichs opened the driver's door of his SUV. And he contends that probable cause did not exist before the odor of burnt marijuana escaped from the opened door. To support this argument, Mr. Miller contends that neither Officer Friedrichs nor Officer Wall could articulate why they believed the smell of marijuana came from his vehicle. Mr. Miller notes that he had parked next to a pickup truck in the alley "for a while." Doc. 27 at 12. He thus contends that the smell the officers noticed could have come from that truck. Mr. Miller also contends that the testimony of Officer Friedrichs and Officer Wall conflicts with that of Officer Hendricks, who smelled only a "faint" odor of marijuana smoke when he approached the vehicle from the north.[3]

The government notes correctly that our Circuit has held "that the smell of burnt marijuana alone establishes probable cause to search a vehicle for the illegal substance." *United States v. Snyder*, 793 F.3d 1241, 1244 (10th Cir. 2015) (citing *United States v. Johnson*, 630 F.3d 970, 974 (10th Cir. 2010); *United States v. Nielsen*, 9 F.3d 1487, 1491 (10th Cir. 1993)). And, where "'officers have probable cause to believe that an automobile contains contraband, the Fourth Amendment does not require them to obtain a warrant prior to searching the car for and seizing the contraband.'" *Id*. (quoting *Florida v. White*, 526 U.S. 559, 563-64 (1999)).

---

[3] Apparently, defendant's counsel argues that Officer Hendricks's memory conflicts with the other officers' testimony. The court sees no contradiction. Quite logically, people in different locations might experience odors at different levels of intensity. Moreover, Officer Hendricks's refusal to enhance his memory makes his testimony all the more credible. Surely, Officer Hendricks knew that saying he experienced a strong odor of burnt marijuana would favor the government's side of this issue. But his testimony was disciplined and, in the court's judgment, believable.

Here, Officer Friedrichs and Officer Wall both testified that they smelled a strong odor of burnt marijuana as they walked toward Mr. Miller's vehicle.  Indeed, Officer Friedrichs testified that he smelled the odor when he was "a step or two behind" the Mountaineer.  Doc. 24 at 50.  And, when questioned by Mr. Miller's counsel about where the odor had originated, Officer Friedrichs testified that it came from inside Mr. Miller's vehicle:

> Q.    Now, was there-- where did you think this smell of marijuana was coming from?
>
> A.    The vehicle.  This-- this vehicle.
>
> Q.    What part of the vehicle?
>
> A.    What part of it?  The interior of it.

*Id*. at 50-51.  Similarly, Officer Wall testified that he first detected burnt marijuana as he stood near the front of his patrol car—about five to ten feet from Mr. Miller's vehicle.  Officer Wall also believed the smell came from the Mountaineer, reasoning that it "was the only occupied vehicle [he] could see and the closer [he] got to it, the stronger the smell became."  *Id*. at 93.  Officer Hendricks testified that he smelled only a faint odor of burnt marijuana and could not identify its source before the driver's door opened.  But he approached the vehicle from an angle different than the one followed by the other officers, and he was some 15 to 20 feet from the vehicle when Officer Friedrichs opened Mr. Miller's door.

Accrediting the officers' testimony, the court concludes that law enforcement had probable cause to search Mr. Miller's vehicle.  Both Officer Friedrichs and Officer Wall testified that, as they approached the vehicle, they detected a strong odor of burnt marijuana emanating from it.  This fact, alone, justified opening the driver's door and searching the vehicle's interior.  *See Snyder*, 793 F.3d at 1244; *see also Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013) ("A police officer has probable cause to conduct a search when 'the facts available to [him] would

warrant a [person] of reasonable caution in the belief' that contraband or evidence of a crime is present." (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983) (internal quotations and citations omitted))). And, although Officer Hendricks testified that he smelled only a faint odor of marijuana, this does not undercut the veracity of Officer Friedrichs's or Officer Wall's testimony. Indeed, Officer Hendricks was 15 to 20 feet from the vehicle before the door opened, and, even from that distance, he could detect marijuana smoke. Probable cause to search Mr. Miller's vehicle existed. The court thus rejects Mr. Miller's argument on this issue.[4]

### c. The court rejects Mr. Miller's request to discredit law enforcement testimony.

Finally, Mr. Miller asks the court to discredit any law enforcement "testimony that attempt[s] to frame what happened in this case as a traffic stop." Doc. 27 at 13. He contends that law enforcement set out on January 5, 2016, to arrest him and coerce him to testify in a state court murder trial. More specifically, Mr. Miller contends:

> The officers were on a mission to seize Mr. Miller and search him and his vehicle the day before his testimony could be very helpful to the prosecution in a State court case against Ralfael Carr, who the authorities believed shot Mr. Miller. There was no accident or coincidence that two or three sets of officers, the last one being seven cars strong, were searching for Mr. Miler that day and night.

*Id*. at 14. Thus, Mr. Miller alleges, "Officer Wheeles may not have actually seen traffic violations and the officers may not have smelled any marijuana at all, at least not until they opened the front door of the truck." *Id*. at 13.

---

[4]     Alternatively, the government contends that a concern for officer safety gave Officer Friedrichs a lawful reason to open the vehicle's door and order Mr. Miller out. *See* Doc. 22 at 9 ("'An officer . . . may order the driver and passengers out of [a] vehicle in the interest of officer safety, even in the absence of any particularized suspicion of personal danger.'" (quoting *United States v. Holt*, 264 F.3d 1215, 1222 (10th Cir. 2001))). And, once the door opened, the government contends that officers would have seen the marijuana blunt sitting, in plain view, in the vehicle's center console. This, according to the government, would have provided law enforcement with probable cause to search the interior of the vehicle. But the court need not reach this question here. As discussed above, officers had probable cause to search the Mountaineer before they reached it.

No dispute exists that the January 5, 2016 surveillance operation targeted Mr. Miller specifically.  Also, it is undisputed that law enforcement hoped to search Mr. Miller's vehicle for evidence of a crime.  But these facts do not make the officers' stop and search of Mr. Miller's vehicle illegal.  *See Whren v. United States*, 517 U.S. 806, 812 (1996) (concluding Supreme Court precedent "forecloses any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved. . . .  Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").  Nor do they suffice to negate the credibility of the law enforcement officers' testimony here.  Indeed, Mr. Miller has adduced no evidence that any law enforcement officer testified falsely.  The court will not discredit witness testimony based on pure speculation, and it declines Mr. Miller's invitation to do so here.

## III.    Conclusion

The government has carried its burden to establish that the initial stop and warrantless search of Mr. Miller's vehicle complied with the privacy protections afforded by the Fourth Amendment.  The court thus denies Mr. Miller's motion to suppress.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Royelle L. Miller's Motion to Suppress (Doc. 15) is denied.

**IT IS SO ORDERED.**

**Dated this 18th day of August, 2016, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**